IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARTHA ANN SKAGGS, | ) | CIVIL NO. 10-00247 JMS/KSC |
| | ) | |
| Plaintiff, | ) | ORDER (1) GRANTING IN PART |
| | ) | AND DENYING IN PART |
| vs. | ) | DEFENDANTS HSBC BANK USA, |
| | ) | N.A. AND BAC HOME LOANS |
| HSBC BANK USA, N.A., and BAC | ) | SERVICING, LP'S MOTION FOR |
| HOME LOANS SERVICING, LP, | ) | SUMMARY JUDGMENT, |
| | ) | (2) DENYING PLAINTIFF'S |
| Defendants. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT AGAINST |
| | ) | DEFENDANT BAC HOME LOANS |
| | ) | SERVICING, LP, AND |
| | ) | (3) DENYING PLAINTIFF'S |
| | ) | MOTION FOR PARTIAL |
| | ) | SUMMARY JUDGMENT AGAINST |
| | ) | DEFENDANT HSBC BANK USA, |
| _____ | ) | N.A. |

**ORDER (1) GRANTING IN PART AND DENYING IN PART
DEFENDANTS HSBC BANK USA, N.A. AND BAC HOME LOANS
SERVICING, LP'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANT BAC HOME LOANS SERVICING, LP, AND (3) DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANT HSBC BANK USA, N.A.**

## I. INTRODUCTION

This action arises from a June 26, 2006 refinancing of the mortgage

loan on Plaintiff Martha Ann Skaggs' ("Plaintiff") residence. Plaintiff's First

Amended Complaint ("FAC") against Defendants HSBC Bank USA, N.A.

("HSBC") and BAC Home Loans Servicing, LP ("BAC") (collectively,

"Defendants") alleges (1) state law claims against both Defendants seeking damages, declaratory relief, and rescission, and (2) a claim for violation of the Real Estate Settlement and Procedures Act ("RESPA") against BAC. On December 22, 2010, the court narrowed the action by granting in part and denying in part Defendants' Motions to Dismiss. *See Skaggs v. HSBC Bank USA, N.A.*, 2010 WL 5390127 (D. Haw. Dec. 22, 2010) ("*Skaggs I*"). Currently before the court are cross-motions for summary judgment on the remaining claims. Based on the following, the court (1) GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment, Doc. No. 73, (2) DENIES Plaintiff's Motion for Summary Judgment against BAC, Doc. No. 75, and (3) DENIES Plaintiff's Motion for Partial Summary Judgment against HSBC, Doc. No. 76.

## II. <u>BACKGROUND</u>

### A.    Factual Background

The court begins by describing the basic factual allegations or evidence of the suit, stated in a light most favorable to the Plaintiff. Many of the salient details of the subject transaction and Plaintiff's subsequent dealings with BAC are set forth and analyzed in the discussion sections that follow.

///

///

### 1.    *Refinancing of Plaintiff's Mortgage Loan*

Plaintiff refinanced the mortgage loan on her residence on June 26, 2006 with Home 123 Corporation ("Home 123").  Doc. No. 4, FAC ¶ 25; Doc. No. 83-1, Skaggs Decl. July 12, 2011 ¶ 28.  Plaintiff had previously undergone surgery on her hand on June 21, 2006.  FAC ¶ 16.  There is evidence that at that time, and in the prior two weeks, Plaintiff was under the influence of prescription narcotics, including Oxycodone.  *Id.*  Her doctor attests that -- although the exact timing was not established -- she "was prescribed the following medications for pre and post-surgery pain:  meloxicam; meperidine; endocet; hydrocodone; fluoxetine; tramadol; and acetaminophen with codeine."  Doc. No. 83-26, Dee Decl. Apr. 18, 2011 ¶ 6.

Most of Plaintiff's claims, sounding in fraud and unfair business practices, stem from the consummation of this refinancing transaction.  For example, Plaintiff asserts, among other things, that Home 123 and its representative, Romeo Anacan ("Anacan"):  (1) falsely represented to Plaintiff that refinancing would not result in a prepayment penalty when it in fact resulted in a $9,000 penalty payment, FAC ¶¶ 11-12; (2) falsely represented that the new loan was a normal fixed rate loan with lower payments than her existing loan when in fact the interest rate and monthly payments were higher and she was obligated to

make a balloon payment after thirty years, *id.* ¶¶ 14-15; (3) required Plaintiff to sign the closing papers despite knowing that Plaintiff was incompetent and incapable of understanding the terms due to the post-surgery pain medication she was taking, *id.* ¶¶ 16-18; (4) did not allow Plaintiff to read the loan documents due to "time pressure," simply told Plaintiff where to sign, and did not explain the documents to her, *id.* ¶¶ 21, 26; (5) misstated Plaintiff's employment income, without her knowledge, as $9,000 per month even though she had no employment income at the time, *id.* ¶¶ 31, 32; and (6) did not provide Plaintiff copies of the loan documents when executed and instead mailed only some of them ten days later. *Id.* ¶¶ 22-23. Upon receiving the loan documents in the mail, Plaintiff asked to cancel the loan, but Anacan responded that she was too late to cancel. *Id.* ¶¶ 28-29.

Plaintiff's prior loan was amortized over thirty years, with a fixed interest rate of 5.45 percent. *Id.* ¶ 13. Her refinanced loan with Home 123 had a fixed interest rate of 6.5 percent over a thirty-year period, but with monthly payments calculated based on a forty-year amortization period (*i.e.*, monthly payments for 359 months as if spread over forty years, and a last balloon payment of over $220,000). *Id.* ¶ 15; Doc. No. 83-7, Wheeler Decl. ¶ 5A; Doc. No. 83-5, Skaggs Decl. Ex. D.

Although the interest rate on the new loan was higher, Plaintiff received over $50,000 as a result of this "cash out" refinancing. Doc. No. 83-6. There is a dispute about whether her monthly housing expenses (principal and interest) were lower as a result of the refinancing, and thus about whether her new loan was beneficial. Under her prior loan, Plaintiff's monthly principal and interest payment was $2,038.00. After the refinancing, her payment rose to $2,546.74. Prior to the refinancing, however, Plaintiff may have had an additional monthly debt payment of $685 (meaning her new housing expenses were lower) -- but there is a dispute as to whether this payment was properly classified as an additional "housing expense." Doc. No. 83-2 at 2; Doc. No. 83-7 ¶ B.1.

Since the refinancing, Plaintiff has remained current on the terms of the new loan. Doc. No. 83-1 ¶ 44. She has not missed a payment and there are no foreclosure concerns at this time. Plaintiff does, however, state that "[her] present mortgage loan has put great stress upon me, both financially and emotionally." *Id.* By this action, she seeks, among other relief, to rescind the transaction and return to the terms of her prior loan. Doc. No. 83 at 23.

## 2. *Request for Information from BAC*

Sometime after the loan transaction, the note and mortgage were transferred from Home 123 to HSBC. That is, HSBC is the current owner and

holder of the note and mortgage, while BAC is its current servicer.  FAC ¶¶ 35-36.

In 2009 and 2010, Plaintiff had attempted to learn the identity of the owner of the

loan.  She attests that she called BAC several times, and BAC either refused to tell

her or told her the present owner was "Wells Fargo."  Doc. No. 83-1 at 1-2.

Plaintiff filed suit on April 28, 2010 against Bank of America, N.A.

("BOA") and Wells Fargo Bank, N.A. ("Wells Fargo").  Doc. No. 1.  The next day,

by letter dated April 29, 2010, Plaintiff's attorney notified BAC via letter that

Plaintiff disputed the amount owed on the mortgage loan and that this letter is a

qualified written request ("QWR") pursuant to RESPA seeking the following

information:

1.    The full name, address, and telephone number of
      the current holder of this debt, including the name,
      address, and phone number of any trustee or
      fiduciary;

2.    A copy of any and all documents assigning the
      note to its owner or owners;

3.    A complete and itemized statement of the loan
      history from the date of the loan to the date of this
      letter, including but not limited to the dates,
      amounts, and purpose of each debit and credit;

4.    The payment dates, purpose of payment and
      recipient of all escrow items charged to this
      account since GMAC took over the servicing;
      [and]

> 5. An explanation of the meaning of and reason for all "principal curtailment" and "principal curtailment reversal" entries.

FAC Ex. F. On May 7, 2010, Plaintiff received a letter from BOA's customer service department, stating that "[i]n order for [BOA] to complete its research of your concerns, we will require written authorization from your client allowing [BOA] to release loan information to your office." *Id.* Ex. G. The FAC asserts that BAC failed to respond to Plaintiff's QWR and improperly responded to both oral and written requests for information regarding the current owner of the note and mortgage by, among other things, stating that Wells Fargo was the current owner. *Id.* ¶¶ 69-70.

## B. Procedural Background

After Plaintiff filed her original Complaint against BOA and Wells Fargo on April 28, 2010, Plaintiff received information regarding the current holder of the note and mortgage from Defendants' counsel. She then filed the FAC against HSBC and BAC on May 25, 2010. The FAC alleged claims for violation of Hawaii Revised Statutes ("HRS") Chapter 480 (Count I), unconscionability (Count II), breach of fiduciary duty (Count III), fraud and misrepresentation (Count IV), unlicensed brokering (Count V), and violation of RESPA (Count VI).

HSBC and BAC moved to dismiss the FAC, and on December 22,

2010 the court (1) dismissed all counts as to BAC except Count VI for violation of RESPA, and (2) denied HSBC's Motion seeking to dismiss claims based upon HSBC's status as a holder in due course. That is, as to HSBC, the FAC stated claims that, if proven, would be valid defenses to enforcement of the mortgage note by a holder in due course such as HSBC. *Skaggs I*, 2010 WL 5390127, at *5-7.

Three summary judgment (or partial summary judgment) motions were then filed. On May 23, 2011, Defendants filed their Motion for Summary Judgment on the remaining claims. Doc. No. 73. On May 24, 2011, Plaintiff filed her Motion for Summary Judgment seeking affirmative relief on Count VI against BAC, Doc. No. 75, and her Motion for Partial Summary Judgment on Count I for rescission under HRS chapter 480 against HSBC, Doc. No. 76. Plaintiff filed her Opposition on July 15, 2011. Doc. No. 83. Defendants filed Oppositions on July 18, 2011. Doc. Nos. 85, 87. Replies were filed on July 25, 2011. Doc. Nos. 89, 91, 92. Defendants supplemented their Motion on July 27, 2011, Doc. No. 93, and Plaintiff responded on August 1, 2011, Doc. No. 95.[1] The court heard the three Motions on August 8, 2011.

---

[1] In an exercise of discretion, the court DENIES Plaintiff's request to strike Defendants' Supplement, as sought in her August 1, 2011 Response.

# III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV.  DISCUSSION

The court first addresses claims against HSBC, and then addresses the remaining claim against BAC.

## A.    Claims Against HSBC

Plaintiff moves for summary judgment on Count I (unfair and deceptive trade practices) against HSBC, seeking an affirmative ruling that the June 26, 2006 note and mortgage are void under HRS § 480-12 and that she is

therefore entitled to rescission. Defendants oppose that Motion, and have filed a

corresponding Motion for Summary Judgment, seeking judgment as to all Counts

of the FAC as to HSBC. As set forth below, HSBC is entitled to summary

judgment on all Counts against it except for (1) Count I to the extent it seeks

rescission under § 480-12, and (2) Count IV to the extent it seeks declaratory or

injunctive relief based upon the loan being void ab initio for fraud. On her Motion,

however, Plaintiff is not entitled to affirmative relief on those two Counts at this

summary judgment stage. For both Motions, genuine issues of material fact

remain as to whether the note and mortgage are void. The court first addresses the

aspects of Count I seeking damages as well as Counts II through V of the FAC,

and then addresses possible rescission under Counts I and IV.

### 1. *Unfair or Deceptive Trade Practices (Count I) -- Claim for Damages*

Count I is based only on conduct occurring during the loan

consummation process. Specifically, it alleges:

> 48.    The false representations as to the terms of the
> loans as well as Plaintiff's income, the failure to give
> documents timely, and the excessive charges in
> connection with the above-described extensions of credit
> were immoral, unethical, oppressive, unscrupulous, and
> substantially injurious to Plaintiffs [sic] as consumers, in
> violation of H.R.S. Chapter 480.

> 49.    The failure to give to Plaintiff a proper and timely
> Notice of Right to Cancel is unfair and deceptive, in

violation of H.R.S. Chapter 480.

Doc. No. 4, FAC at 8. Count I references false representations and other misconduct by the original lender Home 123 and its employee Anacan, leading up to and during the loan consummation on June 26, 2006. *Id.* at 3-6. But neither Home 123 nor Anacan is a Defendant, and HSBC is merely the current holder of the note and mortgage. *Id.* ¶ 35. Count I makes no specific allegations regarding HSBC, and no evidence indicates HSBC participated in the loan transaction or had any knowledge of any alleged misconduct in the loan process. Although HSBC is an assignee of the note and mortgage, "there is no liability [for damages] under [HRS] § 480-2 merely because one is an assignee." *Araki v. Bank of Am.*, 2010 WL 5625970, at *6 (D. Haw. Dec. 14, 2010).[2] *See also Skaggs I*, 2010 WL 5390127, at *3 (dismissing Count I as against BAC because it did not allege misconduct by BAC). Accordingly, Count I fails to the extent it seeks damages from HSBC under HRS Chapter 480.

### 2. *Unconscionability (Count II)*

HSBC is likewise entitled to summary judgment on Plaintiff's claim for "unconscionability" in Count II. Count II asserts in pertinent part that "*Home*

---

[2] While not rendering an assignee "liable," an HRS Chapter 480 claim for rescission may stand against a subsequent assignee, if there are sufficient grounds for rendering the note and mortgage void. *See, e.g.*, *Beazie v. Amerifund Fin., Inc.*, 2011 WL 2457725, at *14 n.14 (D. Haw. June 16, 2011).

*[123]* has engaged in unconscionable behavior and acts to the detriment of Plaintiff[.]" FAC ¶ 51 (emphasis added). Like Count I, Count II fails to allege any misconduct by HSBC and therefore fails to state a claim for unconscionability.

Further, the court has repeatedly found in this context that "'unconscionability' is generally a defense to the enforcement of a contract, and is not a proper claim for affirmative relief." *Kelly v. Bank of Am.*, 2011 WL 2493048, at *10 (D. Haw. June 22, 2011) (citations omitted). Rather, the concept "is asserted to prevent the enforcement of a contract whose *terms* are unconscionable." *Skaggs I*, 2010 WL 5390127, at *3. In her Opposition, Plaintiff simply states that terms of the note and mortgage are unconscionable, but fails to specify any particular term that would be "so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract[.]" *Id.* (quoting *Lewis v. Lewis*, 69 Haw. 497, 501, 748 P.2d 1362, 1366 (1988)). In any event, Count II is pled as an affirmative claim. Thus, the court GRANTS Defendants' Motion as to Count II against HSBC.

### 3. *Breach of Fiduciary Duty (Count III)*

Similarly, HSBC is also entitled to summary judgment on Count III, which asserts that Home 123 breached a fiduciary duty. The court follows "the well-settled proposition that generally a borrower-lender relationship is not

fiduciary in nature[.]" *Kelly*, 2011 WL 2493048, at *9-10 (citing cases).  Plaintiff

attempts to distinguish that proposition by arguing that "special circumstances"

exist here. *See, e.g.*, *Spencer v. DHI Mortg. Co.*, 642 F. Supp. 2d 1153, 1161 (E.D.

Cal. 2009) ("Absent 'special circumstances' a loan transaction is at arms-length

and there is no fiduciary relationship between the borrower and lender.")

(quotation marks and citation omitted).  Plaintiff contends that her condition was

"fragile and vulnerable" and Anacan, with knowledge of her condition, took

advantage of the trust she gave him.  Doc. No. 83, at 25-26, Pl.'s Opp'n, at 20-21.

Even assuming, however, that such circumstances could create a fiduciary

relationship between a lender and borrower, they would not create liability for

breach of a fiduciary duty as to *HSBC* -- an entity that was not involved at all in the

loan consummation.  Count III alleges misconduct by Home 123, and such

allegations do not create a fiduciary duty owed to Plaintiff by HSBC.  The Court

GRANTS Defendants' Motion as to Count III against HSBC.

### 4. *Fraud and Misrepresentation (Count IV) -- Claim for Damages*

Likewise, HSBC is entitled to summary judgment on Count IV to the

extent it seeks damages.  Count IV alleges fraud and misrepresentation based upon

events leading up to the loan consummation:

> 59.    During the period leading up to the closing of the
> loan, Home [123] and its agents represented to Plaintiff

14

that she would get a loan at far better terms than she
actually received.

> 60.    Home [123] and Defendants knew or should have
> known that . . . these representations and failures were
> false and misleading, and that Plaintiff would rely on
> these representations and failures to her detriment.

Doc. No. 4, FAC at 9-10. Count IV further alleges that "[a]s a direct result,

Plaintiff has suffered damages and the loan was void ab initio." *Id.* ¶ 62.

Under Count IV's allegations, any fraud and misrepresentation was

committed by Home 123, not by HSBC. And Plaintiff points to no evidence that

HSBC "knew or should have known" about such fraud. Under these

circumstances, HSBC cannot be liable for any damages caused by Home 123's

alleged fraud. Accordingly, the court GRANTS Defendants' Motion for Summary

Judgment as to Count IV insofar as it seeks damages against HSBC.[3]

### 5.    *Unlicensed Brokering (Count V)*

In Count V, Plaintiff alleges that the June 26, 2006 note and mortgage

are void and unenforceable because Home 123 violated HRS Chapter 454. Prior to

its repeal effective on January 1, 2011, Chapter 454 regulated "mortgage brokers

---

[3] Count IV's request for declaratory and injunctive relief, Doc. No. 4, FAC at 12-13 --
based upon the loan being void ab initio because of fraud allegedly committed by Home 123 -- is
discussed below when addressing whether the loan might be void under Count I.

and solicitors" in Hawaii.[4]  HRS § 454-8 provided, in part, that "[a]ny contract entered into by any person with any unlicensed mortgage broker or solicitor shall be void and unenforceable."  Consequently, Count V alleges:

> 64.    During all times relevant herein, Home [123] acted as a mortgage broker within the meaning of Hawaii Revised Statutes, Chapter 454.
>
> 65.    Upon information and belief, Home [123] was not licensed as a mortgage broker by the State of Hawaii.
>
> 66.    Upon information and belief, Home [123] was not exempt from the requirement to be licensed as a mortgage broker.
>
> 67.    As a direct result, the above-described loan is and was, void and unenforceable.

Doc. No. 4, FAC at 10.

Defendants seek summary judgment on Count V because Home 123 was exempt from chapter 454.  Under HRS § 454-1, a mortgage broker "means a person *not exempt under section 454-2* who for compensation or gain . . . makes, negotiates, acquires, or offers to make, negotiate, or acquire a mortgage loan on

---

[4]  HRS Chapter 454 was replaced by the Secure and Fair Enforcement for Mortgage Licensing Act, HRS Chapter 454F, effective July 1, 2010.  The repeal of Chapter 454 took effect on January 1, 2011.  *See* 2010 Haw. Sess. Laws Ch. 84, § 38.  The present action arose in 2006 and the FAC asserted a Chapter 454 claim on May 25, 2010.  The court thus analyzes the prior statutory provisions.  *See id.* § 35 ("This Act, including the repeal of chapter 454, Hawaii Revised Statutes, effectuated . . . does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun before its effective date."); *Au v. Republic State Mortg. Co.*, 2011 WL 3422780, at *6 (D. Haw. Aug. 4, 2011).

behalf of a borrower seeking a mortgage loan."  (Emphasis added.)  In turn, § 454-2(6) provided that chapter 454 "does not apply to [a] . . . [f]oreign lender as defined in section 207-11."  And HRS § 207-11(C) defines a "foreign lender" as, among other things, "a lender approved by the Secretary of the United States Department of Housing and Urban Development for participation in any mortgage insurance program under the National Housing Act."

In that light, Defendants produce undisputed evidence that Home 123 was such a "foreign lender" in June 2006.  Specifically, a June 29, 2011 Declaration from Jacqueline Jones, an official with the Office of Lender Activities and Program Compliance of the U.S. Department of Housing and Urban Development, confirms that Home 123 was approved by the Federal Housing Administration ("FHA") as an "FHA-approved mortgagee" from April 14, 2000 to July 2, 2007.  Doc. No. 81-1, Jones Decl. ¶¶ 2-3 & Ex. A.  The FHA administers loans under the National Housing Act.  *See* 12 U.S.C. § 1708(a).  Home 123 thus fell squarely within the definition of a "foreign lender" under HRS § 207-11(C), and was therefore exempt from HRS Chapter 454.  Accordingly, the court GRANTS Defendants' Motion as to Count V against HSBC.

///

///

**6.** ***Unfair or Deceptive Trade Practices (Count I) -- Rescission under HRS § 480-12***

HRS § 480-12 provides that "[a]ny contract or agreement in violation of this chapter is void and is not enforceable at law or in equity." Although there is no evidence HSBC did anything "in violation of this chapter," § 480-12 can nevertheless provide a basis for rendering HSBC's note and mortgage "void and unenforceable" based on certain types of unfair or deceptive acts or practices committed by others in the loan consummation process. *See, e.g.*, *Beazie*, 2011 WL 2457725, at *11.

Plaintiff thus moves for partial summary judgment, asserting it is undisputed that Anacan and Home 123 violated Chapter 480 through Anacan's "false representations as to the terms of the loans as well as Plaintiff's income, the failure to give documents timely, and the excessive charges in connection with the [] extensions of credit." Doc. No. 4, FAC ¶ 48. In their Opposition and corresponding Motion for Summary Judgment, Defendants simply disagree, and contend it is undisputed that Plaintiff (1) signed the relevant loan documents and had a "reasonable opportunity" to determine the terms of the loan, and (2) has not met her burden to demonstrate that she can tender the loan proceeds so as to rescind the loan transaction. Defendants thus conclude that the note and mortgage are not void, and, even if so, that they are nevertheless entitled to judgment as a

matter of law. The court DENIES both Motions because the record contains conflicting evidence -- genuine disputes of material fact remain.

a. *Conflicting evidence regarding unfair or deceptive acts*

In denying Defendants' prior Motions to Dismiss, the court determined that the FAC sufficiently alleges facts that, if proven, would constitute defenses to enforcement of the note and mortgage by a holder in due course (and there is no evidence that HSBC is not a holder in due course). *Skaggs I* found the allegations that Plaintiff was under the influence of Oxycodone after her June 21, 2006 surgery could establish she was incompetent to enter the transaction, and incapable of understanding loan terms and making reasonable decisions. 2010 WL 5390127, at *5. It also determined that, assuming the truth of the FAC's allegations as to misconduct by Anacan, "the mortgage note may be void pursuant to HRS § 480-12 and Plaintiff can assert this defense against a subsequent holder such as HSBC." *Id.* And *Skaggs I* discussed the allegation of fraud:

> Specifically, the FAC asserts that Anacan misrepresented essential terms of the mortgage loan (for example, the interest rate and that there was no prepayment penalty), and did not disclose the balloon payment. FAC ¶¶ 11-15. The FAC further asserts that Anacan (1) knew that Plaintiff had recently undergone surgery and was taking pain medication; (2) told Plaintiff that the loan documents needed to be signed that day and they had less than a half hour to complete them, (3) did not allow Plaintiff to read the documents and instead simply told

19

> her where to sign, and (4) told Plaintiff that she could
> rely on him and the loan was as promised. *Id.* ¶¶ 17,
> 19-21. These allegations support both that Plaintiff did
> not know essential terms of the mortgage note and did
> not have a reasonable opportunity to learn them before
> signing.

*Id.* at *6.[5]

Now, at a summary judgment stage, Plaintiff supports each of the key facts alleged in the FAC with corresponding evidence, primarily in the form of Plaintiff's own declarations. *See* Doc. No. 76-2, Skaggs Decl., May 12, 2011; Doc. No. 83-1, Skaggs Decl., July 12, 2011. Plaintiff backs up her theory with an opinion as to her competency from her doctor, *see* Doc. No. 83-26, and analysis by mortgage broker Charles Wheeler, who reviewed the transaction and loan documents and opines that "deception and misrepresentation" occurred. *See* Doc. No. 83-7, Charles Wheeler Decl., April 15, 2011, at 7. Wheeler identified several irregularities in the documents, which, construed in Plaintiff's favor, support that the loan transaction would be void under § 480-12. *See id.* Exs. 1, 6, 9, 11, 16, & 17.

For example, the only loan application actually signed by Plaintiff

---

[5] *See also Long v. Deutsche Bank Nat'l Trust Co.*, 2011 WL 2650219, at *6 (D. Haw. July 5, 2011) (indicating that allegations of lender falsely representing the source or amount of income on the loan application it prepared without borrower's knowledge or consent could constitute fraud).

(which she signed on June 26, 2006) indicates her new loan is fixed at 6.5 percent and amortized over thirty years without mention of any balloon payment. Doc. No. 83-9. Her loan, in fact, was apparently amortized over thirty years (but at a forty-year rate) with a large balloon payment of over $220,000. Doc. No. 88-10, at 8; Doc. No. 83-7 at 1. In contrast to the application signed by Plaintiff, internal Home 123 documents describe Plaintiff's loan as "40 Yr Fix - Balloon 30" or "40/30 Fixed Balloon." Doc Nos. 83-11 to -12. Anacan's handwritten version of the same loan application signed by Plaintiff indicates "40/30" as a loan type. Doc. No. 83-14.

Among other accusations, Plaintiff contends Anacan promised her that she would not incur a prepayment penalty for her prior loan, where she actually paid a penalty of over $7,500 -- and the HUD Statement she signed confusingly (according to Wheeler) identified that amount as an "impound account" whereas a post-closing version of the same document properly identifies that same amount as a "prepayment penalty." *Compare* Doc. No. 83-17 (signed HUD statement) at 3, *with* Doc. No. 83-19 (post-closing version of HUD statement) at 3.

Plaintiff also attests that she was not provided with *any* copies of the loan documents at closing, and only received some documents in the mail ten days later. Doc. No. 76-2, Skaggs Decl., May 12, 2011, at 16. As additional support,

Plaintiff cites to a Notice of Right to Cancel, signed by her on June 26, 2006, that left blank both the date of the transaction and the date by which she must cancel. Doc. No. 76-25. In contrast, Defendants cite a different Notice of Right to Cancel, also signed by Plaintiff on June 26, 2006, that indicates she must cancel by June 29, 2006. Doc. No. 88-10, at 25. Confusingly, it appears there were two Notices of Right to Cancel signed during the transaction.[6] Immediately after receiving copies of documents in the mail, she called Anacan to cancel because the terms were different than promised. Doc. No. 83-1 ¶ 31. He allegedly told her it was "too late" (it was more than three days after closing date), *id.* ¶ 32, -- a representation that may or may not have been true, depending upon which version of the Notice of Right to Cancel applies.[7]

In response to Plaintiff's declarations, Defendants proffer declarations from Anacan and Kalia Morris, an employee of Fidelity National Title Company

---

[6] Plaintiff contends Home 123 violated HRS § 480-2 by "not giving Plaintiff[] any TILA disclosures nor any Notice of Right to Rescind at closing." Doc. No. 83 at 16, Pl.'s Opp'n at 11. To the extent Plaintiff's claim for rescission under § 480-12 is based on TILA violations, the claim is barred. *See, e.g.*, *Beazie*, 2011 WL 2457725, at *13 (reiterating that TILA preempts a claim under HRS Chapter 480, where both are based on a lender's actions and representations in originating the loan) (citing *Kajitani v. Downey Sav. & Loan Ass'n*, 647 F. Supp. 2d 1208, 1220 (D. Haw. 2008). TILA preemption, however, is not a basis for granting Defendants' Motion here because Plaintiff's Chapter 480 claim is based on circumstances beyond TILA violations such as alleged fraud in the loan consummation process.

[7] The Notice of Right to Cancel indicates that, if no date is provided, a three-day period to cancel begins upon receipt of the Notice. *See* Doc. No. 76-25. If Plaintiff did not actually receive a copy of the Notice until ten days after closing, she might still have had time to cancel.

who participated in the loan closing and notarized the signing of documents by Skaggs. *See* Doc. No. 88-1, Anacan Decl.; Doc. No. 88-8, Morris Decl. In his declaration, Anacan contradicts Skaggs on virtually every key point. He contends he talked to Skaggs in the days prior to closing and "explained the kind of loan I could offer her" that would lower her monthly debt payment. Doc. No. 88-1 ¶ 7. He contends Home 123 mailed her a loan package on June 7, 2006 with documents indicating there would be a balloon payment of over $220,000 and containing a separate "Balloon Disclosure." *Id.* ¶ 8. He contends at closing he "went over the key terms of the loan with Ms. Skaggs[.]" *Id.* ¶ 18. He denies telling her he was in a rush, that she should rely on him, or that she would not have to pay a prepayment penalty to her prior lender. *Id.* ¶¶ 17-18. He states there was no indication she "was drugged or unable to understand" events and she never mentioned she was on medication. *Id.* ¶ 16. He also contends that "one set" of loan documents was left with Skaggs at the end of closing. *Id.* ¶ 19.

Morris's declaration similarly contradicts Skaggs. Her declaration indicates Skaggs showed no indication that she was not competent or unable to understand what was happening at closing. Doc. No. 88-8 ¶ 4. Morris acknowledges that Skaggs indicated she was in pain from surgery, but states that Skaggs did not mention being on medication. *Id.* ¶ 5. Morris indicates she

handled the signing of documents, and went over the terms of each document with Skaggs. *Id.* ¶ 6. She also attests that she left one set of loan documents with Skaggs at closing. *Id.* ¶ 8. Morris emphasizes she would not have allowed Skaggs to sign documents if Skaggs had stated she was taking any drugs or if Morris had observed that Skaggs did not understand what she was doing. *Id.* ¶ 9.

Defendants also respond to Wheeler's opinion by proffering an opinion of Clifford Kurata, a banker with forty years of experience, who attempts to explain each of the matters raised by Wheeler. *See* Doc. No. 88-10. Kurata reviewed Wheeler's opinion and relevant documents and concludes that "no misleading or deceptive information was conveyed to [Plaintiff]" and "there was no intentional deceit or misrepresentation by the lender." *Id.* at 2, 3.

Given the conflicting evidence, summary judgment in favor of Plaintiff is clearly improper. There are numerous and obvious genuine issues of material fact as to whether unfair or deceptive acts occurred during the loan transaction.

As to their Motion, Defendants do not seriously argue otherwise. Rather, they focus on whether Plaintiff had a "reasonable opportunity" to understand the terms of the documents that she signed. *See* HRS §490:3-305(a)(1(iii) (subjecting a holder in due course to a defense of "fraud that induced

the obligor to sign the instrument with neither knowledge nor *reasonable opportunity* to learn of its character or its essential terms") (emphasis added). The court now turns to that issue.

### b.    *Defendants' Motion -- opportunity to understand*

Defendants contend that, even assuming Plaintiff did not actually understand the terms of the documents she was signing, she had a reasonable opportunity to determine the loan's terms. Defendants imply that any undesired loan terms were her own fault given her simple failure to read what she was signing. Defendants point to Plaintiff's deposition, where she acknowledges that, at closing, Morris or Anacan told her what various documents were (or at least told her the title of documents). *See* Doc. No. 90-4, Skaggs Depo. at 78-79, 82, 90.

Regardless, Plaintiff indicates she could not fully understand the loan terms because she was under the influence of prescription narcotics (Oxycodone and Percocet). *E.g.*, *id.* at 80. She is supported by her doctor, Dr. Peter Dee, who provides a history of prescriptions and opines that she would not have been able to comprehend the nature of the loan documents. Doc. No. 83-26, Dee Decl. at 2-3.

In response, Defendants proffer expert testimony of Dr. Jeffrey Wang, who reviewed Plaintiff's medical records and points out that Plaintiff had told Dr. Hahn (her hand surgeon) on June 23, 2006 -- three days before the loan closing --

that she had used up her medications and was unable to fill a prescription for Demerol and Percocet after her June 21, 2006 surgery. *See* Doc. No. 88-12; Doc. No. 88-13 at 19. According to reports, she was unable to fill a new prescription until June 27, 2006 -- the day after loan closing. Doc. No. 88-13 at 19. Dr. Wang concludes that "it does not appear that she was under negative influence from medications[.]" Doc. No. 88-12. But, even assuming Plaintiff told Dr. Hahn she had used her medicine from prior prescriptions, it does not necessarily follow that she was not incapacitated on June 26, 2006 (or in the key times leading up to closing, when she was, or should have been making choices and decisions about her loan).

Indeed, Defendants' medical evidence also helps Plaintiff -- the same report of Dr. Hahn referred to by Dr. Wang also indicates "significant concerns of opioid abuse" and that Plaintiff "certainly may have a substance abuse problem." Doc. No. 88-13 at 19. Other independent medical records indicate that on June 8, 2006 -- the day after Anacan says he mailed the loan package to Plaintiff -- Plaintiff was "disheveled" and "quite sleepy and she was up all night due to pain." *Id.* at 17. Another medical report indicates "narcotic medication prescribed for [Plaintiff's] pain contributed significantly to the poor choices she made" during relevant periods, and describes her condition before her surgery as "disheveled,

tearful, histrionic, and occasionally sedated." *Id.* at 31. The medical records Defendants produce thus actually support the proposition that Plaintiff did not have the capacity to understand the loan transaction at the very time that Anacan says he was obtaining consent from her to change certain loan terms.

In short, there are significant questions of fact as to whether Plaintiff had a "reasonable opportunity" to understand the documents, *i.e.*, whether she lacked capacity -- a defense to enforcement of the note and mortgage by a holder in due course. *See Skaggs I*, 2010 WL 5390127, at *5. Given numerous questions of fact, Defendants' Motion as to rescission under Count I is also DENIED.[8]

### c. *Rescission -- ability to tender*

Even if Home 123's alleged misconduct amounted to unfair or deceptive acts under § 480-2, rescission under § 480-12 does not necessarily or automatically follow. *Beazie* stated that a plaintiff seeking affirmatively to void a mortgage transaction under § 480-12 must be able to "place the parties in as close a position as they held prior to the transaction." *Beazie*, 2011 WL 2457725, at *13.

---

[8] Likewise, there are questions of fact as to the availability of declaratory and injunctive relief based upon the note and mortgage being void ab initio for fraud (Count IV). Although Plaintiff does not actually ask for rescission under Count IV, she does seek to "terminate any security interest which any Defendant may claim on Plaintiff's home and that the Court declare all such security interest of Defendants void," Doc. No. 4, FAC at 12, as well as to enjoin Defendants from "instituting, prosecuting, or maintaining foreclosure proceedings[.]" *Id.* To that extent, Defendants' Motion as to Count IV seeking equitable relief is also DENIED.

That is, "parties must be returned to the positions they previously held." *Id.*

Simply voiding the note and mortgage, and allowing a plaintiff to own property

free and clear, would likely unjustly enrich a mortgagor. *Id.* at *12. *Beazie* based

this ruling in part on the equitable discretion the Ninth Circuit has discussed in

considering similar TILA rescission claims under 15 U.S.C. § 1635(b). *Id.* at *7

(citing *Yamamoto v. Bank of N.Y.*, 329 F.3d 1167, 1173 (9th Cir. 2003)). In

particular, when analyzing possible rescission under TILA, *Yamamoto* explained:

> As rescission under § 1635(b) is an on-going process consisting of a number of steps, there is no reason why a court that may alter the sequence of procedures *after* deciding that rescission is warranted, may not do so *before* deciding that rescission is warranted when it finds that, assuming grounds for rescission exist, rescission still could not be enforced because the borrower cannot comply with the borrower's rescission obligations no matter what. Such a decision lies within the court's equitable discretion, taking into consideration all the circumstances including the nature of the violations and the borrower's ability to repay the proceeds. If . . . it is clear from the evidence that the borrower lacks capacity to pay back what she has received (less interest, finance charges, etc.), the court does not lack discretion to do before trial what it could do after.
>
> Whether the call is correct must be determined on a case-by-case basis, in light of the record adduced. . . . We simply decide that in the circumstances of this case, the court did not lack discretion to modify the sequence of rescission events to assure that [borrower] could repay the loan proceeds before going through the empty (and expensive) exercise of a trial on the merits.

*Id.* at 1173. The factors described in *Yamamoto* as to rescission under TILA can apply in making decisions about rescission under HRS § 480-12 as well, depending on "all the circumstances" before the court.

Under *Beazie*, for Defendants to obtain summary judgment on Plaintiff's affirmative claim seeking rescission as a remedy, Defendants must first meet their burden under Rule 56 to "establish that Plaintiff cannot tender the loan proceeds." *Id.* at *13. If they do so, Plaintiff must then submit evidence to create a genuine issue of material fact that she can "place the parties back to their original positions" to avoid summary judgment. *Id.*

Defendants contend they have met their burden to demonstrate Plaintiff cannot tender. During discovery, Defendants served Plaintiff with their Second Request for Production of Documents in which Defendants sought "any and all documents relating to a loan or loans you have obtained to tender to HSBC the sum to which it is entitled if the Loan is rescinded and/or held void" or similar loans for which Plaintiff has applied, or any documents "relating to any source of funds to tender" loan proceeds. Doc. No. 94-2 at 6. Plaintiff did not respond with any documents. Doc. No. 94-3. Defendants have no evidence, however, that Plaintiff has insufficient income, nor evidence -- whether good or bad -- of her financial situation. Defendants nevertheless argue that they have met their burden

to demonstrate an inability to tender because Plaintiff responded with no documents.

In Opposition, Plaintiff reiterates that she had made timely mortgage payments on the subject loan, and has never missed a mortgage payment (and the record supports her, Doc. No. 86-2). She has not been delinquent in payment of the subject loan. The loan is not in foreclosure. She thus argues there is every indication she would make payments on a new loan. And there is no evidence she has been denied a loan that might refinance the subject mortgage. Rather, she states that she is unable to apply for a new loan until she knows how much to apply for. Plaintiff declares that if "the Court orders a return to the . . . time just prior to the making of this loan, I am able and willing to do that." Doc. No. 83-1 at 7, ¶¶ 44-45. She also argues that the court has discretion to "devise a suitable tender to protect both Plaintiff and HSBC." Doc. No. 83 at 23.

Construing the evidence in favor of Plaintiff, the court DENIES Defendants' Motion seeking summary judgment on the claim for rescission under § 480-12. Even assuming Defendants have met their initial burden to show this court that there is an absence of genuine issue of material fact that Plaintiff can tender the loan proceeds, *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1102 (9th Cir. 2000), Plaintiff has met her corresponding burden to create a

genuine issue of material fact that she could, if ordered, "place the parties in as close a position as they held prior to the transaction." *Beazie*, 2011 WL 2457725, at *13. That is, the court cannot make a factual finding at this stage that Plaintiff cannot tender loan proceeds back, *i.e.*, that Plaintiff cannot place the parties back to their original positions. "[T]aking into consideration all the circumstances," in the record, it is simply not "clear from the evidence that [Skaggs] lacks capacity to pay back what she has received." *Yamamoto*, 329 F.3d at 1173.

### d. *Availability of attorney fees under Chapter 480*

Defendants also assert that Plaintiff would not be entitled to recover statutory attorney fees, even if Plaintiff prevails on a claim for rescission based on the loan and mortgage having been found "in violation of [Chapter 480]." That is, even if the note and mortgage are "void" and "not enforceable at law or in equity" under HRS § 480-12 -- so the argument goes -- Plaintiff would not be entitled to attorney fees. Defendants argue that attorney fees may only be awarded under HRS § 480-13 if a plaintiff also recovers damages against a defendant under Chapter 480. They contend that if rescission is based on unfair or deceptive practices of Home 123 -- not HSBC -- then Plaintiff should not be able to recover attorney fees from HSBC.

Although perhaps relevant later, it would be improper for the court to

decide this hypothetical question now.  The question of attorney fees is not ripe --

whether Plaintiff would be entitled to attorney fees under Chapter 480 would not

arise unless Plaintiff actually prevails on her rescission claim and actually proves

that the note and mortgage are void and unenforceable.  On the other hand, if

Defendants prevail on this claim, the question of attorney fees never arises.  The

court cannot decide this abstract question at this stage.  *See Graham v. Hartford*

*Life & Accident Ins. Co.*, 501 F.3d 1153, 1161-62 (10th Cir. 2007) (concluding that

a motion for fees was not ripe "when the presence of ongoing litigation precludes

an informed determination of whether the moving party is in fact entitled to

attorney's fees under the relevant law") (citations omitted); *Kapuwai v. City &*

*Cnty. of Honolulu*, 121 Haw. 33, 40-41, 211 P.3d 750, 757-58 (2009) (determining

that lack of final decision on underlying claim rendered question of entitlement to

attorney fees under Hawaii law "premature, *i.e.*, not ripe" so as to constitute an

improper "advisory opinion").

## B.     Count VI (RESPA) Against BAC

Lastly, the parties essentially cross-move for summary judgment on

the only claim remaining against BAC, Count VI, which alleges BAC violated

RESPA by "failing to properly respond to a valid qualified written request[.]"

Doc. No. 4, FAC ¶ 69.

RESPA provides that "[i]f any servicer of a federally related mortgage loan receives a qualified written request[9] from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days[.]" 12 U.S.C. § 2605(e)(1)(A). "Servicing" is defined as:

> receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3). After receiving the QWR, within sixty days, the loan servicer must either correct the borrower's account or, after conducting an investigation, provide the borrower with a written explanation of: (1) why the servicer believes the account is correct; or (2) why the requested information is unavailable. *See* 12 U.S.C. § 2605(e)(2).

---

[9] A qualified written request is defined as:

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that:
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

Initially, much of Plaintiff's claim against BAC is based on oral

inquiries Plaintiff made in 2009 and 2010 where she was attempting to determine

the owner of her mortgage.  Plaintiff attests:

> 2.     Beginning in the summer of 2009 and through the
> summer of 2010, [I] attempted to learn the identity of the
> owner of [my] loan by calling [BAC].
>
> 3.     These telephone calls totaled no less than five
> hours as there were numerous calls and [I] often had to
> wait on the line for 15 to 30 minutes.
> . . . .
> 5.     On at least three occasions in 2009 and 2010, BAC
> told [me] that the present owner of [my] mortgage loan
> was Wells Fargo.
>
> 6.     Because BAC told me that Wells Fargo was the
> owner of my loan, I filed this action initially against
> Wells Fargo and paid a $350 filing fee in that regard to
> sue the wrong entity.

Doc. No. 83-1 at 1-2.  Even assuming the truth of these statements, however, they

would not establish a violation of § 2605(e).  By definition, a QWR must be "in

writing" -- oral requests are insufficient to trigger action under 2605(e)(2).  *See,*

*e.g.*, *Barbera v. WMC Mortg. Corp.*, 2006 WL 167632, at *6 (N.D. Cal. Jan. 19,

2006) (dismissing § 2605 claim because, among other reasons, "RESPA imposes

obligations upon a party upon written requests, not oral") (citing 12 U.S.C.

§ 2605(e)(1)(B)).  Further, as this court noted in *Skaggs I*, "RESPA does not

require that a loan servicer provide information on the holder of the note."  2010

WL 5390127, at *4 n.4.

Thus, Plaintiff's RESPA § 2605 claim must be limited to BAC's responses, or lack of responses, to the April 29, 2010 letter from Plaintiff's counsel to BAC. In that regard, the court has already determined in denying BAC's prior Motion to Dismiss as to Count VI that at least part of that letter requested "servicing" information so as to constitute a QWR. *See id.* at *4. In particular, *Skaggs I* determined that "Plaintiff's counsel . . . sought information regarding servicing and it does not appear that BAC provided either Plaintiff or her counsel this information within the sixty-day statutory window." *Id.* Given that prior ruling, Plaintiff moves for summary judgment, asserting that she is entitled to judgment as a matter of law on Count VI.

In opposition, Defendants argue that, even assuming BAC did not properly respond to the letter, Plaintiff has a burden to plead and demonstrate she has suffered damages under 12 U.S.C. § 2605(f)(1). Section 2605(f)(1) provides:

> Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:
>
> (1) Individuals
>
> In the case of any action by an individual, an amount equal to the sum of --
>
> (A) any actual damages to the borrower as a result

of the failure; and

> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

Defendants contend Plaintiff failed to plead such damages caused by a failure to respond to a QWR, and has no such evidence now. *See, e.g.*, *Shepherd v. Am. Home Mortg. Servs., Inc.*, 2009 WL 4505925, at *3 (E.D. Cal. Nov. 20, 2009) ("[A]lleging a breach of RESPA duties alone does not state a claim under RESPA. Plaintiff must, at a minimum, also allege that the breach resulted in actual damages.") (quoting *Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 383 (D. N.J. 2006)); *Soriano v. Countrywide Home Loans, Inc.*, 2011 WL 1362077, at *6 (N.D. Cal. Apr. 11, 2011) (reasoning that "even if a RESPA violation exists, Plaintiff must show that the losses alleged are causally related to the RESPA violation itself to state a valid claim under RESPA").

The FAC alleges only that "BAC improperly responded to both oral and written requests for information regarding the current owner of the subject note and mortgage, including but not limited to, advising Plaintiff that Wells Fargo was the current owner of the subject note and mortgage." Doc. No. 4, FAC ¶ 70. There are indeed no allegations of actual damages caused by an improper response. It fails to state a claim on that basis. *See Shepherd*, 2009 WL 4505925, at *3.

More importantly, at this summary judgment stage, Plaintiff has no evidence of "actual damages" under § 2605(f)(1)(A).[10] She argues that she was given wrong information regarding the current owner of her note and mortgage and incurred a filing fee by filing suit against the wrong party, Wells Fargo. Even if such information were related to servicing, however, it was sought orally. And Plaintiff filed suit against Wells Fargo *before* the QWR -- this suit was filed on April 28, 2010 against Wells Fargo and BOA, which was the day before Plaintiff's QWR -- and thus Plaintiff could not have incurred a filing fee as a result of being provided the wrong information in response to a QWR.

Similarly, Plaintiff claims as actual damages the $5.54 cost for

---

[10] There is no evidence in the record that BAC has a "pattern and practice of noncompliance" for purposes of statutory damages under 12 U.S.C. § 2605(f)(1)(B). Although Plaintiff's Concise Statement of Facts states that it was a "persistent and ongoing practice at BAC" to tell customers that Wells Fargo was the owner of loans, Doc. No. 79 at 2, ¶ 3, there is no evidence supporting this statement. Rather, Plaintiff cites language from an email from Defendants' counsel (copied from an email from Wells Fargo) stating:

> [m]any times in the past Countrywide [apparently a predecessor of BAC] would make the assumption that Wells [Fargo] was the investor simply because they were sending all the payments to Wells for processing. Unfortunately, it is incorrect, and is causing a lot of unnecessary litigation for Wells [Fargo] like this case.

Doc. Nos. 75-5; 83-32. This statement, assuming its admissibility, is not evidence that BAC had a "pattern and practice of noncompliance" with RESPA in failing to respond properly to qualified written requests.

Similarly, there is no evidence that the May 7, 2010 letter from BAC to Plaintiff's counsel asking for "written authorization from your client allowing Bank of America to release loan information," Doc. No. 83-31, was a standard "practice of noncompliance" with RESPA by BAC.

certified mail in sending the April 29, 2010 QWR letter.  In this regard, she cites

*Cortez v. Keystone Bank, Inc.*, 2000 WL 536666 (E.D. Pa. May 2, 2000), which

stated that "[a]ctual damages [under RESPA] encompass compensation for any

pecuniary loss including such things as time spent away from employment while

preparing correspondence to the loan servicer, and expenses for preparing,

photocopying and obtaining certified copies of correspondence." *Id.* at *12.

Nevertheless, Plaintiff seeks the cost of mailing a QWR itself, not any *subsequent*

costs incurred by the failure to respond to that QWR.  *Keystone Bank* did not find

that such QWR costs constituted "actual damages" under RESPA.  Plaintiff's

proffered mailing cost could not have been "a result of" BAC's failure to respond

to that QWR as necessary under § 2605(f)(1)(A).[11]  *See, e.g.*, *Lal v. Am. Home*

*Servicing, Inc.*, 680 F. Supp. 2d 1218, 1223 (E.D. Cal. 2010) (precluding damages

in the form of filing fees emphasizing that "RESPA, as codified at 12 U.S.C.

§ 2605(f)(1)(A), authorizes 'actual damages to the borrower *as a result of* the

failure [to comply with RESPA requirements].'").

---

[11]  Indeed, another case cited as support by Plaintiff, *In re Tomasevic*, 273 B.R. 682 (Bankr. M.D. Fla. 2002), suggests the costs related to the initial QWR are not recoverable. *Tomasevic* stated that "[t]he cost of photocopies and postage would be compensable as actual damages if it is incurred in furtherance of seeking the bank's compliance with [RESPA] and the debtor can establish a violation of that statute." *Id.* at 688.  But *Tomasevic* specifically noted that "the debtor has made no claim for photocopies or postage in sending a written qualified request but instead has claimed those costs only in connection with court proceedings," *id.* at 688 n.4, -- implying that costs for sending the QWR itself are not recoverable under RESPA for a violation based on that QWR.

Likewise, Plaintiff seeks the value of her lost time (five hours at $12 per hour) spent "on the telephone with BAC at various times in 2009 and 2010 [attempting] to learn the owner of my mortgage loan." Doc. No. 75-1 ¶¶ 8-9. But even assuming the value of her time could constitute actual damages, the time Plaintiff spent was not "as a result of" a failure to respond to a QWR, much less a failure to respond to the April 29, 2010 QWR letter.

Plaintiff also attests to suffering emotional distress and contends such damages are recoverable under RESPA. The Ninth Circuit has not decided whether emotional distress can constitute "actual damages" for purposes of § 2605(f), and cases are split. *See, e.g.*, *Hutchinson*, 410 F. Supp. 2d at 383 n.14 ("It is unclear whether 'actual damages' under RESPA encompasses emotional distress. The district courts are split and no Court of Appeals has addressed the issue.") (citing cases).[12] Other caselaw indicates that the "majority of . . . federal courts . . . [find] that such emotional damages are a part and parcel of the 'actual damages'" under § 2605(f). *Wienert v. GMAC Mortg. Corp.*, 2009 WL 3190420, at *10 (E.D. Mich. Sept. 29, 2009). "[C]ourts that 'have examined § 2605(f) have

---

[12] The Seventh Circuit recently approved of such damages for a § 2605 violation. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011) (reasoning that "plaintiffs' testimony is sufficient to preclude summary judgment for GMAC Mortgage on the question of whether the plaintiffs suffered emotional harm as a result of GMAC Mortgage's actions -- and inaction" under RESPA).

consistently found that 'actual damages' includes emotional distress damages."

*Moon v. GMAC Mortg. Corp.*, 2009 WL 3185596, at *5 (W.D. Wash. Oct. 2, 2009).

The court need not adopt either position.  Here, even assuming Plaintiff suffered emotional distress and such distress can suffice as "actual damages" under § 2605(f), Plaintiff has not established that her distress damages were "as a result of" the lack of response to the April 29, 2010 QWR.  She attests that

> [t]his entire experience has been very stressful and emotionally draining to me.  I have lost sleep, have suffered headaches, have suffered anxiety, have felt betrayed and deceived, all as a direct and proximate result of not being able to get a straight answer as to who was the owner of my mortgage and who had potential rights to my home.

Doc. No. 75-1 ¶ 11.  Even construing this statement in Plaintiff's favor, her distress was not related to the April 29, 2010 QWR letter.  *See Lal*, 680 F. Supp. 2d at 1223.  Moreover, the distress was not a result of a failure to give "servicing information" -- instead, it was a result of "not being able to get a straight answer as to who was the owner of my mortgage," which is information not required under RESPA.  What's more, even if she was requesting "servicing information," it was an oral request and thus cannot cause liability for failure to respond to a QWR

40

under RESPA.[13]

Accordingly, because Plaintiff has failed to carry her burden both to plead and establish any actual damages caused by a RESPA violation, the court DENIES Plaintiff's Motion, Doc. No. 75, and GRANTS Defendants' corresponding Motion for Summary Judgment as to Count VI.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the court 1) GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment, Doc. No. 73, (2) DENIES Plaintiff's Motion for Summary Judgment against BAC, Doc. No. 75, and (3) DENIES Plaintiff's Motion for Partial Summary Judgment against HSBC, Doc. No. 76. As a result, the remaining claims in the action are: (1) Count I to the extent it seeks rescission and attorney fees under HRS ch. 480, and (2) Count IV to

///

///

///

///

---

[13] While this Order was being finalized, Plaintiff submitted a letter dated August 30, 2011 citing *Edwards v. First American Corp.*, 610 F.3d 515 (9th Cir. 2010) and *Lyon v. Chase Bank USA, N.A.*, No. 10-35486, slip op. (9th Cir. Aug. 30, 2011) as being relevant to the damages aspects of Plaintiff's RESPA claim. Those cases, however, have no bearing on the issue here -- whether Plaintiff has any evidence of actual damages "as a result of" a failure to respond to a QWR under 12 U.S.C. § 2605(f)(1).

the extent it seeks equitable relief for fraud.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 31, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Skaggs v. HSBC Bank USA, N.A., et al.*, Civ. No. 10-00247 JMS/KSC, Order (1) Granting in Part and Denying in Part Defendants HSBC Bank USA, N.A. and BAC Home Loans Servicing, LP's Motion for Summary Judgment, (2) Denying Plaintiff's Motion for Summary Judgment Against Defendant BAC Home Loans Servicing, LP, and (3) Denying Plaintiff's Motion for Partial Summary Judgment Against Defendant HSBC Bank USA, N.A.